Good morning, your honors. My name is Matthew Winter. I'm from the Federal Public Defender Office here in Honolulu. With me is Cynthia Cagiguada. She is co-counsel on this case. I represent Mr. Villa. Ms. Cagiguada represents Mr. Frias. What I'm hoping to do is argue for ten minutes, give Ms. Cagiguada my remaining time, and I think the two of us would hope that we could preserve about two minutes, two to five minutes of rebuttal time. Well, let's just keep it within the – usually when we – what do we put on this, 20 minutes? Yes, 20 minutes. Ms. Cagiguada has some different – the main issue that I'm going to argue is the Giglio issue. She's going to address some of the points that concern her client. And then she raised, I believe, two other issues in her brief. But as to the Giglio issue, your honors, in this case, the government was aware of evidence that one of its key witnesses in the case was either dealing drugs or attempting to deal drugs prior to the beginning of the jury trial. This defendant was a former defendant, co-defendant in this case, who was released on pretrial release. The government knew of this information weeks before trial, followed up on this information with an agent who set up additional meetings, phone calls to corroborate this information, then thought it was of at least a constitutional importance enough to tip off the district court. When it did, the government went to the district court, literally the day before trial, and exposed this evidence to the district court. What is said to the district court is that we have corroborated evidence that this individual is either dealing drugs or attempting to deal drugs while on pretrial release. This individual has been followed up by other agents. This witness that the government – or the government has a cooperating informant that has actually met with this person, had discussions about the drugs, and then tried to set up meetings. This cooperating witness is someone that the government trusts, someone that the government has used on some major law enforcement activities, including activities in the investigation of law enforcement officers, is someone that's trusted, and someone that that agent had been personally working with for the past six months. The error here is compound, and it's occurred at two places. First is when the government, weeks before the trial, failed to then personally disclose the information to the defense. They have a duty under Giglio and Brady at that point when they know of impeachment evidence, especially impeachment evidence affecting one of its key witnesses, to turn that information over to defense counsel. Would it be enough to turn it over to the judge on the ground that we've got an agent that we don't want to uncover? I don't think so. Not in this case. And what I would invite the court to look at is the concurring opinion in the DuPay opinion,  The government stands, I think their argument in their brief is that the question, materiality is the test, and that's the test under Brady at Giglio, not reliability. So bringing in the judge was really an attempt for the government to pass off its question of reliability, which was not an issue the day before the jury trial. The day before the jury trial, all the evidence pointed to that fact that this witness was stealing drugs. Only after that point, when the issue got punted into the weeks during the jury trial, did the government come back with its subsequent briefing. But to answer your question, the DuPay opinion says that the government may be able to go to the judge with questions like this in situations where it's a close call, where the government can't figure out that on its face this is Giglio evidence or Brady evidence. And here there was no such close call. Every single factor pointed to the fact that their key witness was doing this. It is unbelievable impeachment evidence in a case of this magnitude, and it became the main witness of the trial in an issue that was not able to, or the defense was not able to follow up. So I believe in certain cases where maybe materiality is a question, they can go to the district court, and in cases where it's a close call. But in cases where it's on its face, where they know right there and then that they have a duty under Giglio and Brady, where they have, and especially in this situation, where even their follow-up evidence or their follow-up investigation proved the initial facts that this person was either dealing drugs or trying to deal drugs. Well, I'm not sure that that's what the record shows. Tell me why the evidence is so clear that he was dealing drugs. Well, there's two people in this case. There was actually Mr. Farias out there, and he was approached by the confidential informant and the associate of a confidential informant. The record establishes that the confidential informant had the closest ties to the agent, and that was someone that the government saw as very reliable. Close ties with who? The government, the government agent. It was the government agent, agent Dye in this case, I believe was probably the handler of the confidential informant. She had been someone that had been working with this confidential informant on many other cases, and it's stated in my brief, but the government went through some length to tell the district court how trusted this person was during that meeting. That confidential informant was working with someone who's been described as the associate. The associate's the person that made the initial meetings with or the initial contact with Doug Farias, and that's who reported back to the confidential informant, and the confidential informant then reported back to the district court. But why I think we know that something was happening here, and that it's more than just speculation at this point, and again, I think speculation isn't really the issue. Materiality, not reliability, is the issue. But in case we are down that road, at least for now, the subsequent actions by agent Dye to then contact her confidential informant to set up other phone calls and other meetings with that associate and Doug Farias corroborate at least the fact that there was something going on in this case. Drug dealing or the attempt to start drug dealing while he was out with the drug dealers. The corroboration would have to come from Farias himself, and he didn't come to the meeting. Exactly, and that's exactly why that that test is the reliability of whether or not this occurred should have happened first in the jury trial. The counsel should have had the Sixth Amendment right to cross-examine that individual, or at least if the judge wanted to save all this from and somehow insulate the jury from this, have a pretrial hearing on the admissibility of this expert. Have a time, or not an expert, of the witness. Release the information to the defense. Give the defense the opportunity to investigate this, and then maybe through a series of motions have the issue of whether or not the testimony is actually admissible hashed out before the jury trial. What the district court did, and where her error occurred in this case, is when she said that when she told the prosecutor to fix the problem, essentially she was presented with giglio evidence. There was no other side. The defense had no presentation there, and the district court call after call said, there's a giglio problem here. I have a problem with this witness. There's a cloud over this witness. We need to let the defense know. And at this point, with just this one-sided information given to the district court, the district court erred by saying, now you try to fix the problem. So I think essentially there's two errors in this case. First, when the government should have turned this over weeks prior to the trial. And second, when given to the district court that the district court did not at that point put a halt to the trial, tell the government that you either need to disclose this evidence now or you need to not call this witness, dismiss this case, something like that. Back to the DuPage case on whether or not the government insulates itself or can bring this to the district court. Yes, they can. But with a case of this magnitude, with something this obvious, at least at that level, even if they had correctly brought it to the district court, the evidence that was presented at that hearing, even the one-sided evidence presented at that hearing, showed nothing but the facts that he was either drug dealing or likely drug dealing. Any subsequent information that was submitted ex parte to the district court and to this court only deals with the government's follow-up on the reliability or their belief of the reliability. And we know from Sixth Amendment cases, Crawford confrontation cases, that courts rightly should distrust issues of reliability that are based upon one party's assertions or one party's findings. What I would point out to this court also is the recent line of cases from this court, starting with Silva, with Blanco, and with Bernal Lobiso. Those are all recent cases, at least Silva and Blanco are, that have dealt with an issue of Giglio information or Brady information coming before the court. In at least two of those cases, the court chose to remand the case back for a hearing as to whether or not the evidence was sufficient or something that should then be followed up on. In essence, this court told the district court to have a factual hearing on what exactly the evidence is, let's see if it rises to a large Giglio or Brady violation, and then we'll take the case back. In this case, we know what the evidence is. And I need to go back to this point again because at that point when the government knew it, it was the impeachment evidence. From that point, defense counsel could have used that evidence to cross-examine the witness. At that point, even if reliability became the issue, it was an issue then for the jury to decide. Defense counsel could have said, didn't you meet this associate? Didn't you meet the confidential informant at that wedding? And didn't you discuss drugs, Mr. Farias? Mr. Farias on the stand could have said no, but then it's up to the jury to decide. And they could have followed up with the other investigation. Well then, didn't you get a phone call from this other confidential informant, the associate, to try to do this? And Doug Farias then again could have said no. But defense counsel didn't even get that option. The error occurred because the Brady, the Giglio tests require a finding of materiality. The evidence at that point was material. The nondisclosure by the government, the failure for the district court to then disclose it to the defense counsel created error. The fact that this court knows what this record is and knows what the potential for it is here doesn't put it into the situation of Silva 1 or the Blanco case where it needs to be remanded. We know where it is. We know we're not just at the tip of an iceberg. We know we have a trial where defense counsel was unable, because they didn't know, to even ask the first question about the drug dealing or Mr. Farias's other doings while he was on pretrial release. We know from the one-sided presentation to the district court that something was up, that defense counsel should have been able to follow up, and that the contacts by the agent corroborated it to a very good extent. Your Honors, I'm at nine minutes now. I'd like to, unless you have any questions. Mr. Farias, you're saying he was never asked whether he's doing drugs now, right? You know, I don't know that. I know at trial, in the appropriate form for him to be asked in the adversarial proceeding, I don't believe he was asked. And I know especially he wasn't asked about his ongoings with these nefarious individuals, the confidential informant or the associate. And I think those are issues that really would have affected this trial. Farias was the person that identified Mr. Villa on the tapes. Freya was the person that was really the only witness that really pointed and said Mr. Villa was involved. He was the only person that had actual contact with Mr. Villa, or through his testimony did. Only three witnesses really talked about Mr. Villa's role in this case, and out of them, Farias was not only the person that identified the codes supposedly used on the tapes, but also the ongoings of Mr. Villa. All right. Thank you. May it please the Court. I'm Cynthia Kagiwara on behalf of Defendant Appellate Roy Frisby. And I would actually just like to address the Brady-Giglio issue, just a couple of points that the Court raised. First of all, Judge Kamby, your concern about the confidential informant and whether or not the government did what they should have by submitting this to the Court. Even if there was a concern about revealing the identity of the confidential informant in this case, there was something else that the government could have done. They could have disclosed that there was a confidential informant, redacted the name, and more importantly, there was the associate. The government knew the name of the associate. They could have at least disclosed that information to the defense. But the point here is that no information about this drug dealing by the key witness in the case was disclosed at all to the defense. And that's what's resulted in the unfair trial in this case, is no information was given to the defense. The defense was not able to impeach Mr. Correas with any of this information, nor was the defense able to conduct its own investigation. And allowing the government to go on and investigate, do some kind of investigation as to whether or not there was actual drug dealing there, I would submit, is not a substitute for the defense being allowed to have this information and be able to conduct a fair trial in this case. If there aren't any questions, I'd like to reserve the rest of the time for rebuttal. Thank you. May it please the Court. My name is Lou Bracco, and I was the trial assistant in this case. I also wrote the briefs on appeal. And from the oral argument made by counsel, I think the main attack here is the Brady-Diglio issue, the in-camera presentation. And I disagree strongly with their argument. I submit that we did everything right in this case. They assume by their argument that there was this actual impeachment information of Doug Correas, who was one of the witnesses, and not even the key witness. The key witness was Jack Grisby. But he was certainly a second important witness. He was an important witness. And they assume that this information exists. I submit, as I submitted to Judge Gilmour, and I argued my brief, this information was totally speculative. It amounted to nothing more than rumor. In every drug case where you have accomplice witnesses, and this Court knows that most, 90 percent of the drug cases you have an accomplice witness, you can create this alleged Brady-Diglio issue through rumor. All you need is one of the defendant's friends or one of his associates to say, hey, your witness is dirty. And then all of a sudden the government has to go through this disclosure situation that they are talking about. I don't think so. I think we did the right thing. We had this information. We didn't know what to make of it. In the first place, let me just explain how this information came to the Court. It came to a different agency. Laura Dye, who was a customs agent, heard through her informant and the associate that there might be this guy out there, Doug Farias, who was dealing drugs. And Doug Farias was dealing drugs way before. So the issue was when Laura Dye first brought it to the attention, it's like, well, is he still dealing drugs? And she undertook steps to determine that. Because all she had is secondhand hearsay information. She had an informant who she believed was reliable. We're not fighting that. But this informant had an associate, and the associate doesn't know the informant's informant. And the associate then reports to the informant, hey, I was at this wedding with this guy, Farias, and Farias thought maybe he could do a drug deal. So the associate, whose reliability is not known, then reports that to the informant, who in turn reported to Laura Dye. As a good agent, Laura Dye does some background information. She tries to see if anything would happen because they're talking about, you know, a significant quantity that he's involved. And nothing comes of it. Laura Dye also finds out that this guy, Farias, who is potentially a subject for her, is a witness in the government's case-in-chief, and she brings the information to me. And this was only, by the time I got it, according to what's in the in-camera hearing, a couple of weeks prior to trial. And we're figuring out what to do with this, and at the same time, Laura Dye is trying to set up this meeting where Farias supposedly comes. There's no tape recording. There's no information that Farias comes to the meeting. He doesn't do anything on tape. So we alert Judge Gilmour to the problem. We file a pleading, which was filed more than the day before trial. It was filed on the week before, the Friday before the actual hearing day. And we go in to see Judge Gilmour. And what does Judge Gilmour do? She listens to the explanation about how it's double hearsay. The government's position is conjecture. I cited her cases in the pleading that just based on the law, you don't have to disclose this conjectural type of information because it's purely conjectural. But Judge Gilmour, being cautious, says, no, I want more information. And this is not, as the defense is saying, where she's bouncing it back to the prosecutor or refusing to rule. Or Judge Gilmour saying, look, I really don't know anything, any information about this associate. I can't make a determination as to whether or not this is the kind of information which goes beyond rumor, so it has to be disclosed. So can you get me some more information? I want you to get me some more information about this person so I can find out if this rumored conjectural information rises to the level of something that I have to consider whether it's going to be disclosed or is it just a rumor that rumors have out of the case. So what we do is we go out, as explained in the sealed pleading, we go out, we find the associate. We identify him. And then under a guise, we send the FBI out to interview that person on the grounds that, saying that they're following up the Farias wiretap information and he was on the phone with Farias. And what do you know, sir, about Mr. Farias? Do you know anything about any of his drug trafficking? When was the last time you saw him? Did you ever have any conversation with him? And what does the associate say when he says, you know, I haven't even seen the guy in seven months. I don't know anything about whether he deals drugs or not. I don't know if anything he does. I heard that he was arrested and is involved in drug trafficking. And so, you know, I have no information about the guy. And so we bring that information back to Judge Gilmour in the form of, you know, a sealed submission with the actual report of what the witness said. And Judge Gilmour looks at it and she says, you know, I agree. There's nothing here. There's nothing beyond conjecture. You furnished me no reliable information which suggests that this witness is engaged in drug trafficking or even had the conversations that the defense attributes to him. So I don't see anything here. So there's nothing to be disclosed. That's what happened. And I think that I don't know why the defense has seized upon this issue as something that, you know, frankly, judges, I'm a little bit offended that I thought I did a good job when I did this trial in a lot of ways. And one of the ways was bringing the information to the court in the next party proceeding. And I'm offended that Mr. Winter, who wasn't the trial counsel, and by the way, nobody, well, but he accused myself and Judge Gilmour of colluding to deprive the defendant of impeachment information in this case. And I think that's a little strong. I don't know that I read it in that way or page 37 of his brief. He accuses. I can tell you what. This is on page 37. However, the most striking error stems from the district court collusion with the government. Instead of acting as the protector of due process, the district court suggested it would grant a fivolous condition. And it basically goes on to say that both the district court and the prosecutor were acting in bad faith. And I certainly know I wasn't. And I don't believe Judge Gilmour was. We were trying to deal with a ruler that in an abundance of caution I brought to the court's attention. You do with the argument that the judge really it's not really up to the judge to decide whether this is reliable. Well, that that can't be correct. Your Honor, because there has to be some indicia of reliability in a room or or any information that somebody throws out there about a witness. Because otherwise it doesn't rise to the level of anything beyond rumor or conjecture. There must be something reliable, some some meat to disclose. Otherwise, how could it be used or how could it be of any value to the defense? Conversely, in any drug case, can't can't someone say, oh, you know, you have five accomplice witnesses. You know, I heard all five were out there drug dealing the week before trial. And then what is the government supposed to do with that rumor? How can you effectively negate a rumor if the if you don't have to show some reliability before it's anything beyond a rumor? Because in any drug case, the defense can do that. So obviously there must be. And the cases say that I cited in in my brief and in the party pleading that I submitted to Judge Gilmour. I cited some cases, some from the Ninth Circuit, from this court and others were Second Circuit cases that say. And these are serious cases. I remember one was an organized crime case where the rumor was about the witness that the that the prospective witness had committed a murder or participated in a murder. And that was the rumor out there. And the Second Circuit said, hey, unless there's some indicia of reliability, some meat to this. You don't have to disclose this because it's just rumor. It doesn't rise beyond the level of rumor. So the government's position is we were exactly in the same position with Mr. Farias. There was nothing that rose to the level beyond rumor, especially I submitted to Judge Gilmour at the first in-camera hearing. But certainly after Judge Gilmour directed us to go out and get more information for her so that she could satisfy herself, which if you look at the in-camera hearing, those were Judge Gilmour's concerns. Judge Gilmour was concerned that this was basically there might be something more to it than a rumor, that there could be some actual drug dealing on the part of Farias or maybe something more. And she was concerned until we went out and proved it. And in the minute order that you see that she ultimately signed, she basically said, look, I don't find that there was anything here. It's not more than a rumor. And I also submit, Your Honor, there are other things that explain. Even if Farias was out there talking drugs, as I put in my brief, you know, he was cooperating with the government at the time. Historically. I mean, he was looking for 5K credit, for cooperation credit. So when you have a witness in that situation who's cooperating with the government, the agents tell him, they say, hey, look, who else do you know who's doing drug dealing? So one of the reasons he could have been talking about that is he could have, to the extent they even believe it was said, which the in-camera hearing refutes, he could have, it could have been saying to sort of line up and see who else might be dealing drugs so he can give that name to the agent. Another thing the record shows is that the record shows that Farias was afraid of Roy Frisby. Roy Frisby and Villa, by the way, were both career criminals. And Roy Frisby had a very violent criminal history, which is reflected in his pre-sentence report. And the judge found that he was a three-time career criminal. And Frisby may, I mean, Farias may well have been afraid of Roy Frisby and not wanting to know that, the Frisby camp to know that he was cooperating against them. So he may have been talking drugs just to, like, let out the word to the community business as usual. In other words, there's a number of things that explain, even if Frisby had been, even if Farias had been talking drugs, why he might be willing to do it. But, and so that's why I argued to Judge Gilmour. But Judge Gilmour made me go one step further. Not only did we take away those explanations, but we showed that the associate to whom the information was attributed to had no such information. So there's nothing to disclose. And one other thing that you need to know about this is, this is not information that's brought to the attention of law enforcement saying, hey, you know, I know some guy who's doing drugs. Even on the best scenario that the defense can paint this, this is an informant who's a reliable informant who has a distant relative, I believe the evidence was that it was a cousin from the hearing, who's at a wedding, who picks up hearsay information at the wedding, that this guy, Farias, might be willing to do a drug deal. Is that the kind of reliability that would require disclosure? Not according to the cases of this court that I cited in my brief, and not according to the case of the Second Circuit. So I would like to probably touch on the other. I had a question for you, Mr. Bracco. There's been a claim here of vouching. And in your closing argument, I read in about eight different places where you said such things that that has the ring of truth, or he has no reason to be lying, and why don't you, could you not believe the FBI agents? It seems to me that, if not over the line, that that was getting pretty darn close. You know, that's why I quoted, I know the defense made fun of me when I did it, I quoted Judge Trotz from Weatherspoon. In the first place, where I said that, I always referred to the evidence. If you look, and I cited in my brief, the number of times that I said, I submit from the evidence, I submit the evidence shows, I submit you can tell from the evidence. So I'm always referring to the evidence. And the cases say that you can do that. You can say that a person from the evidence has no motive to lie. You have to understand what happened in this case. Pamela Byrne, who was the trial counsel for the defense, came out in her opening statement and said, I'm going to show you basically two things, ladies and gentlemen. I'm going to show you, number one, that these were all accomplices, and they're all motivated to lie because they all have plea agreements, and they're all here to please the prosecutor. So she attacked them from the outset. And she also attacked from the outset the credibility of the FBI agents. She said, you know, the FBI didn't record this. The only thing that you're going to have is the word of the FBI that Villa made an oral statement which implicated him in the conspiracy because he admitted to the FBI about a month before when they were doing all the follow-up interviews for the wiretap on the people that Farias was talking to. I don't know why we should give much credence to anything like that because the FBI won't record any of these statements, unlike every other police department in the country. Well, I'm not a good advocate to defend the FBI's practice of not recording. No, you probably would like to have the police council not say all those things. Right, but I'm not greater than the FBI. I have to live with what the FBI does. But I have to say, in this case, Your Honor, there was so much other evidence. And there was a second. In fact, Ms. Byrne called a second FBI agent to testify. So there were two FBI agents who testified to the same statement. And it was also written in one of the reports, although not in the agent's notes, which was some kind of other subsidiary issue at trial. So the evidence that Mr. Villa made the statement, that he knew that the monies were at least derived from drug activities as opposed to that he dealt in drugs, because he didn't admit that. He just admitted that he knew that the monies that he was receiving from Farias and because of the Bruton fraud, we didn't put in the other part. So he admitted that. That was corroborated by two FBI agents. And it was unchallenged, except for challenges. Counsel, you're kind of arguing against yourself. It speaks for itself that you put on evidence that the jury could believe. And then you come along and say you've got to believe it. Well, I didn't say – I said from the evidence, you can believe it. Well, you said there's no reason not to believe the FBI. From the evidence. You said that three different times. Oh, but Judge, I said from the evidence. I understand what you're saying, but because of this appeal, I went back and I read and reread and I read again last night my summation. And I respectfully point out to the Court that I said from the evidence, there's no reason to disbelieve. Because this was in the face of a challenge to the credibility of the FBI. And it's the same – it's the same – well, you know, I – you read the summation. And I can only say that I – this case in Nekirchia, this Court's case, says that it's not improper. I submit statements are not improper. This is what the Court said in Nekirchia. It said the I submit statements do not constitute vouching. As long as you say that you submit from the evidence. And it was clear. I think if you read the whole summation, Your Honor, you'll see I referenced the evidence. I was talking from the evidence. I was submitting from the evidence. That's what was before the jury. This was not vouching. I wasn't vouching for the credibility of the FBI statements. I was not vouching for the accomplice witnesses, if you look, you know, and read it. I was talking about they were credible from the evidence. And I quoted at length some snippets from the testimony. And you can see where I said that there is no reason to lie. For example, I quoted one where Donald Morton was the testimony. I said there's no reason for Morton to lie because from the evidence, his testimony has the ring of truth. And then I pointed out the evidence where the ring of truth was. And, you know, that argument is proper. I had a different question on vouching. What can be. How can there not be a vouching implication when you ask the defendant, whether the judge that's sitting there conducting the trial is going to sentence that defendant? Well, there's a couple of things. First of all, I brought that out just as the background of the information. In other words, it seems to me that the real danger there is that the implication of the jury is, well, boy, the judge is going to make sure this witness tells the truth, because if the witness doesn't, the judge will really stop that. Well, that's what that's what the defense argued in their brief. But that wasn't why it was brought out. It was brought out as background. And you're here on a plea agreement. You're hoping to get a favorable sentence. What judge is going to sentence you? One right up there at the head of the court. But the jury, the jury knew about it because they knew. Well, but why? Why do you have to say it? Well, in hindsight, I might not. I might it might have been better if I didn't say it. But it wasn't vouching. It's not vouching. Number one, there's no case that's ever said that that's vouching. And number two, it's possible to vouch in ways that cases have never said. Well, number two, even if I shouldn't have said it, and even if this court were to find that somehow it implicates vouching, you know, that's the plain error because it was unobjected to. And clearly, in the face of the overwhelming evidence of the drug dealing of Mr. Frisbee and Mr. Villa, clearly it doesn't meet the plain error standard. I can see why the court thinks that or might think that I shouldn't have said that. But in hindsight, I might not have might not have brought that out again. You know, I know that, you know, I know that I've been attacked. I feel like, you know, I'm I'm I'm on trial. This is when I tried this case. But all this is vouching. Don't worry. We're easy. Well, if you just let me defend myself a little bit. I mean, I think that some of this information, like you bring out the fact that the witness was debriefed. It's hard to examine a witness in a vacuum. Normally you call the witness and you say, you know, were you arrested? Did you cooperate? Did you give information? I mean, I didn't bring out any of the content of any prior statements. I didn't bring out that the prior statements were used to get any information. I brought that out as background. So, you know, to say that to say that all that is vouching and then to take snippets of little things that happen here and there and put it all together, that that I was vouching, I mean, he's with these accomplice witnesses were insiders. They testified to direct hand to hand transactions with the defendant. I don't believe that it was vouching. But to the extent the court feels that it crossed the line as it may have been said already, clearly it doesn't rise to the plain air standards so that these defendants substantial rights were affected. I think it was too bad. Does the court let me address any of the other issues? I like everybody to feel good when they leave this place. Just in closing, though, I really feel on the in-camera disclosures. I feel that for all the reasons that I said in the brief, that this was just conjecture. I can't imagine. I just see in every case by the defendant can put the word out and say, you know, he can have somebody do an anonymous phone call or somebody send a letter to the U.S. attorney's office and say, hey, you know, they never testified. Who never testified? Well, Mr. Freer testified. Yes. Thank you. And your honor, I want to start by saying the appeals don't happen because, you know, Mr. Bracco isn't a good person. He's a good person. It's just the appeal happened because the record is what it is. Why do you have to accuse the judge of colluding with him? Your honor. Why do you have to say that? Well, your honor, the night before trial, this evidence was presented to the judge. And I think if you read the transcript, it's definitely scary from a defense attorney's perspective as to what was happening there. The judge started by saying. The word collude has got certain very negative implications. It's not a smart word to use. It's probably a poor choice. It's a stupid word to use, I think, in this context. I'll submit on that. It's just my feeling on that. I'll take your advice. I want to just address a couple of points, though. Whether this could happen in every case. I don't think it could happen in every case. I think that's kind of a slippery slope argument. I think what would happen is what should have happened in this case. A full and fair disclosure to defense counsel. The ability to investigate. If the district court did have concerns, then a pretrial hearing on the matter to flesh it out. If the district court didn't have those concerns, then it's in front of the jury. If it's proven before the jury as rumor and conjecture, then it's a dumb defense counsel that attacked the witness for those reasons. The defense counsel loses credibility for throwing something like that out there. However, if it does have a basis in truth, if it is something that impeaches the witness, then it's the Sixth Amendment right to bring that up. And it allows the case to do exactly what jury trials are supposed to do, which is to define the truth from these different sets of facts that we have. The government got to investigate this evidence. They had the ability to go forward. But as we know, in many occasions, there's always two sides to the story. And many times when a case goes to trial like this, there are. And I think this case really calls out for what would happen if the defense not only got to question the witness about just what was known from that hearing, but to actually go out and investigate, use its own witnesses, its own investigators to try to find out the facts of what truly happened. As I put in the brief, I can't imagine what the witness would have said to the government agents. Hey, we have the idea that you might be dealing or trying to deal in pound quantities of methamphetamine. Is that true or not? I think any smart person would probably deny or have an exculpatory no at that point. As to the vouching, I think the record speaks for itself in this case. I think this case is a case about credibility. And I think it's a case about credibility from the first issue that we raised through the vouching issue. I think the key to the government's case here is through its witnesses because, again, Mr. Villa was not caught red-handed. It was only through the government's witnesses could they point this or convict Mr. Villa. The government then, in each and every one of the witnesses, followed the same path, which was really stating to the jury that the witnesses had debriefed truthfully to the government agents, then that the witnesses were telling the truth before the court that was sentencing them, and then the final is the vouching that occurred in the closing argument. I think the record speaks for itself on that. All right. If the Court has any questions. Thank you. Thank you. The matter stands permitted.
judges: Goodwin, B. Fletcher, Fisher